1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

ABOBAKKR DIRAR, and
MOHAMED ELAMIN,

                    Plaintiff(s),

    v.

ALASKA AIRLINES, INC.,

                    Defendant.

CASE NO. 2:22-cv-1076

COMPLAINT FOR DAMAGES
AND JURY DEMAND

## I.    INTRODUCTION

1.          Since September 11, 2001, persons who are, or are perceived to be, Muslims have

endured heightened levels of discrimination due to bigotry and fear mongering, particularly

in air travel. This prevalent Islamophobia is often wrapped in racism and xenophobia aimed

at Black and Brown people of Arab origin or from Muslim majority countries. Throughout

the United States, individuals who share such identities have been shamed for merely

existing in such public spaces. Their mere presence aboard an airplane is often unjustly

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 1

LUIS F. SEGURA (WSBA #58859)
CAIR WASHINGTON
1511 THIRD AVE., # 788, SEATTLE, WA 98101
(719) 629-7753

seen and treated as a threat, causing airline employees and passengers to be on edge and view them with suspicion. This sad reality of targeted discrimination is particularly known to those engaged in the business of providing air travel services. On February 17, 2020, Alaska Airlines admittedly capitalized on this knowledge by exploiting the discredited Islamophobic, racist, and xenophobic claim of one passenger in order to humiliate and deny Abobakkr Dirar and Mohamed Elamin their rights as ticketed passengers.

2.      Accordingly, Abobakkr Dirar and Mohamed Elamin ("Plaintiffs"), by and through their Council on American Islamic Relations ("CAIR") attorneys, bring this action against ALASKA AIRLINES, INC. ("Defendant"), for compensatory damages, punitive damages, injunctive and declaratory relief, and attorney's fees for unlawful discrimination on the basis of perceived religion, race, color, ethnicity, alienage and national origin. Defendant's actions were in violation of 42 U.S.C. § 1981 and the Washington State Law Against Discrimination, RCW 49.60.030. Defendant's actions caused Plaintiffs to suffer mental and emotional distress, stigmatization, damage to their personal and professional reputation and opportunities, and fear and apprehension associated with air travel. As such, Plaintiffs seek declaratory and injunctive relief requiring Defendant to desist from and remedy such egregious discriminatory treatment of passengers by Alaska Airlines personnel.

3.      Abobakkr Dirar and Mohamed Elamin are friends and colleagues who are both male, Black, Muslim, bearded, Middle Eastern, Sudan-born citizens of the United States who predominantly speak Arabic and some English with a pronounced Arabic accent.

4.      On February 17, 2020, Plaintiffs were seated in the first-class section of Alaska Airlines Flight 304, stationed at the C-Concourse gate of Seattle-Tacoma International Airport, awaiting departure for a business trip to San Francisco. While awaiting departure,

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 2

Plaintiffs occasionally made small talk with each other in their native Arabic, and Plaintiff Dirar used Arabic text and emojis in a friendly text exchange with a friend who was not aboard the plane. After an unsubstantiated and disproven complaint against Plaintiff Dirar by a non-Arabic speaking co-passenger who became upset upon seeing some of Plaintiff Dirar's texts, Defendant, directly and/or by and through its agents and employees, proceeded to self-servingly discriminate against Plaintiffs based upon their perceived religion, race, color, ethnicity, alienage and national origin by using Plaintiffs as scapegoats in an admittedly unjustified and unnecessary display of security theater which included: removing and barring Plaintiffs from their contracted-for seats aboard Alaska Airlines Flight 304; humiliating Plaintiffs before their fellow passengers by unnecessarily deplaning said passengers and allowing them to observe Plaintiffs surrounded by uniformed law enforcement personnel; subjecting Plaintiffs to additional unnecessary security measures after having already confirmed to police that Plaintiff Dirar's text messages were innocuous and that Plaintiffs posed no threat; and by prohibiting Plaintiffs from flying together aboard subsequently-booked Alaska Airlines flights, thereby downgrading Plaintiff Elamin's seat and forcing Plaintiffs to arrive at their destination hours later than their originally contracted flight.

5.     The arbitrary and capricious nature of Defendants' actions was confirmed by their own admissions to Port of Seattle Police officers, as documented in a police report. Alaska Airlines personnel informed a responding officer that the incident was a "misunderstanding between passengers," that "everything was fine," that "there was no threat of any kind," and that "police were no longer needed." However, as the police report documented, despite having already confirmed that Plaintiffs posed no threat, Alaska Airlines stated that

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 3

LUIS F. SEGURA (WSBA #58859)
CAIR WASHINGTON
1511 THIRD AVE., # 788, SEATTLE, WA 98101
(719) 629-7753

it nevertheless intended to request and conduct unnecessary measures to "show [the other passengers] that Alaska Airlines was concerned about their security and took this incident seriously." The arbitrary and capricious nature of Defendant's actions was further confirmed by the fact that, even after discriminating against Plaintiffs by unnecessarily removing and barring them from their contracted-for seats and humiliating them before their fellow Flight 304 passengers, Defendant re-booked Plaintiffs for subsequent Alaska Airlines flights that same day but unjustifiably discriminated against them further by prohibiting them from traveling together.

6.        Through its actions, Defendant essentially weaponized Islamophobic, racist, and xenophobic fears by using Plaintiffs as human props in an admittedly unjustified, unnecessary, and self-serving display of discriminatory security theater. By the time Plaintiffs finally reached their destination, they were too humiliated and traumatized by Defendant's actions to enjoy their trip. Their trauma was exacerbated by knowing that such public mistreatment would give credence to Islamophobic, racist, and xenophobic beliefs which have plagued the Muslim community in the United States for decades. The emotional distress Plaintiffs suffered continues to impact them to this day, and they are retraumatized each time they consider booking a flight. As a result of Defendant's discriminatory abuse on February 17, 2020, Plaintiffs have felt immense pressure to take precautions in travel which non-Arabic/Middle Eastern travelers do not have to consider and which no traveler should ever have to take. These precautions, specifically designed to conceal and downplay their identity and avoid similar discriminatory abuse in air travel, include: avoiding air travel whenever possible and, thereby, enduring long distance road trips and suffering the physical discomfort, inconvenience, loss of time, and added financial

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 4

LUIS F. SEGURA (WSBA #58859)
CAIR WASHINGTON
1511 THIRD AVE., # 788, SEATTLE, WA 98101
(719) 629-7753

costs associated with such trips; avoiding taking flights together; arriving at the airport hours earlier than customary to account for delays from potential repeat discriminatory abuse; avoiding use of their cell phones and keeping them powered off in airports and on airplanes whenever possible; and avoiding speaking in their native Arabic in airports and on airplanes as much as possible.

## II.    PARTIES, JURISDICTION, VENUE

7.      Plaintiff Abobakkr Dirar ("Plaintiff Dirar"), is an adult, male, Black, Muslim, bearded, ethnically Sudanese, Middle Eastern-born citizen of the United States of America who predominantly speaks Arabic and some English with a pronounced accent and resides in the State of Washington.

8.      Plaintiff Mohamed Elamin ("Plaintiff Elamin"), is an adult, male, Black, bearded, Middle Eastern, Sudan-born, Muslim citizen of the United States of America who predominantly speaks Arabic and some English with a pronounced accent and resides in the State of Washington.

9.      Defendant Alaska Airlines, Inc. ("Defendant" or "Alaska Airlines"), is an American air carrier engaged in the business of transporting passengers, headquartered in the State of Washington, with its primary hub located at Seattle-Tacoma International Airport.

10.     Upon information and belief, at all times relevant hereto, the captain of Alaska Airlines Flight 304 ("Alaska Captain"), a male Alaska Airlines manager who identified himself to Plaintiffs as Mr. Noor ("Alaska Manager Noor"), and an unidentified female Alaska Airlines manager ("Unnamed Female Alaska Manager") who was present with Alaska Manager Noor during their encounter with Plaintiffs were agents and employees of

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 5

Alaska Airlines and were acting within the scope of their employment with Alaska Airlines.

11.     This court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as the claims averred herein arise out of civil rights violations under 42 U.S.C. §1981.

12.     Pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction over the state law claims in this action because they form the same case and controversy as the federal claims and arise out of the same events: Alaska Airlines' discrimination against Plaintiffs in unnecessarily removing and barring them from their originally scheduled flight, scapegoating and using Plaintiffs in an unnecessary display of security theater, and unnecessarily prohibiting Plaintiffs from traveling together on subsequently booked flights.

13.     Venue is proper for the United States District Court for the Western District of Washington pursuant to 28 U.S.C. § 1391 because for the purposes of venue, at all relevant times hereto, Plaintiffs resided in this district, and/or a substantial part of the events or omissions giving rise to this claim occurred in this district, and/or Defendant resides in this district.

### III.    FACTS

14.     On or about February 17, 2020, Plaintiffs Dirar and Elamin were ticketed passengers traveling together aboard Alaska Airlines Flight 304, awaiting departure from Seattle-Tacoma International Airport to San Francisco International Airport.

15.     Plaintiffs are friends and, on February 17, 2020, were partners in a medical transport business scheduled to fly one-way to San Francisco for the purpose of conducting a business-related purchase of vehicles which they intended to drive back to Washington State.

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 6

16.      Plaintiffs were seated on opposite sides of the aisle in the second row of the first-class section of the airplane, with Plaintiff Dirar seated in seat 2C and Plaintiff Elamin seated in seat 2F.

17.      Plaintiffs occasionally spoke to each other in their native tongue, Arabic, while boarding and sitting aboard the airplane.

18.      A passenger, later identified in a Port of Seattle Police report as Christopher Chapeta ("Passenger Chapeta"), was seated immediately next to Plaintiff Dirar.

19.      While waiting for the plane to complete boarding, and still within the permitted cell phone use period prior to take-off, Plaintiff Dirar was casually using his cell phone, texting in Arabic with a friend who was not aboard the plane.

20.      Upon information and belief, Passenger Chapeta did not speak, read, or understand Arabic.

21.      Upon information and belief, Passenger Chapeta became alarmed upon seeing the Arabic text exchange on Plaintiff Dirar's cellphone screen.

22.      Passenger Chapeta did not speak with Plaintiff Dirar nor raise any inquiry to Plaintiff Dirar regarding the text messages.

23.      Passenger Chapeta abruptly stood up, grabbed his bag, walked towards the front exit, spoke to a flight attendant, and loudly proclaimed that he was not going to stay on the plane before exiting.

24.      Upon information and belief, Passenger Chapeta reported a concern about Plaintiff Dirar's above-mentioned Arabic text messages to the flight attendant and/or other Flight 304 personnel.

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 7

25.     Upon information and belief, Alaska Captain, an agent and employee of Alaska Airlines acting within the scope of his employment, was notified of Passenger Chapeta's concern regarding the Arabic text messages observed on Plaintiff Dirar's cell phone.

26.     Shortly thereafter, Alaska Captain announced a delay due to what he described as a "technical issue" over the airplane's intercom system and subsequently spoke with Alaska Manager Noor, an Alaska Airlines manager and an agent and employee of Alaska Airlines acting within the scope of his employment, who had just entered the airplane through the front entrance.

27.     After the delay announcement, Plaintiff Elamin used the first-class lavatory and, upon exiting the lavatory and seeing Passenger Chapeta's seat to be unoccupied, temporarily sat directly next to Plaintiff Dirar to continue chatting during the delay.

28.     Shortly thereafter, Alaska Manager Noor, who was wearing a suit and carrying a piece of paper, approached Plaintiffs and ordered them to deboard to discuss a "ticket issue."

29.     Plaintiffs asked Alaska Manager Noor to explain the "ticket issue," but Alaska Manager Noor refused and stated that he would explain further once Plaintiffs grabbed their carry-on luggage and deboarded the plane.

30.     Plaintiffs complied with Alaska Manager Noor's instruction by calmly and peacefully grabbing their belongings and exiting the plane.

31.     During the above-described events, there was no barrier between the first-class and coach sections of the plane during the above-described exchange, and passengers throughout the airplane watched as Plaintiffs were singled out and removed by Alaska Manager Noor.

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 8

32.     At no time prior to removal from the airplane did any Alaska Airlines personnel give any instruction or make any inquiry to Plaintiffs regarding their actions or texts or inform Plaintiffs of the true reason for their removal.

33.     After removing Plaintiffs from the airplane and escorting them to the gate area, Alaska Manager Noor informed Plaintiffs that he was a manager for Alaska Airlines.

34.     Once they were escorted to the gate area, Plaintiffs also observed Unnamed Female Alaska Manager, a white female in an Alaska Airlines dress uniform who assisted and accompanied Alaska Manager Noor throughout the remainder of the encounter.

35.     Alaska Manager Noor stated to Plaintiffs that "one of [them]" had been suspected of sending "improper" text messages and that he had been tasked with translating said messages from Arabic to English to determine whether the messages posed any threat.

36.     Alaska Manager Noor informed Plaintiffs that he was of Moroccan descent and at times spoke to Plaintiffs in Arabic.

37.     Upon information and belief, Alaska Manager Noor understands written and spoken Arabic.

38.     Both Plaintiffs offered to show their phone, but Alaska Manager Noor only expressed interest in specifically reviewing the contents of Plaintiff Dirar's phone.

39.     Alaska Manager Noor reviewed content on Plaintiff Dirar's cell phone, including a full review of the text messages in question.

40.     During Alaska Manager Noor's review of Plaintiff Dirar's texts, he asked follow-up questions about the nature of the exchange, and Plaintiff Dirar complied by politely answering all questions asked.

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 9

41.     The string of text messages reviewed by Alaska Manager Noor was written predominantly in Arabic text with numerals and emoji characters.

42.     Upon review, Alaska Manager Noor discovered that the text messages in question consisted of separate exchanges which took place over a two-year time span and were completely innocuous.

43.     As reflected in a police report associated with this incident, the questioned string of messages involved two sets of exchanges between Plaintiff Dirar and his friend Muatsim, written predominantly in Arabic characters with some usage of English words and emoji characters; the texts involved the type of cheerful small talk typical of any exchange between friends.

44.     The first exchange in the reviewed text thread dated back to May 6, 2018, almost *two years* prior to the date of this incident, and involved a lighthearted exchange about Muatsim's family members, while the second exchange took place on February 17, 2020, the date of this incident, and involved a friendly check-in and some compliments by Muatsim about photos he had seen of Plaintiff Dirar.

45.     After asking Plaintiff Dirar some follow-up questions and confirming that the text exchange in question was completely innocuous, Alaska Manager Noor took photos of said text exchange from Plaintiff Dirar's phone screen.

46.     Alaska Captain, a male in a captain's uniform, emerged from Flight 304 and spoke with Alaska Manager Noor within a few feet of Plaintiffs at the gate area.

47.     Alaska Manager Noor showed Plaintiff Dirar's cell phone to Alaska Captain and explained the friendly and non-threatening nature of the Arabic text exchange in question within earshot of Plaintiffs.

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 10

48.     After Alaska Manager Noor finished speaking with Alaska Captain, he informed Plaintiffs that they would not be permitted to reboard Flight 304 and escorted them out to the Alaska Airlines ticketing area.

49.     Plaintiffs asked Alaska Manager Noor if they were the reason for the flight delay, and Alaska Manager Noor replied in the affirmative.

50.     Alaska Manager Noor stated to Plaintiffs that the delay and removal was "airline procedure."

51.     Alaska Manager Noor further explained that Plaintiffs would be reticketed for later Alaska Airlines flights but would be prohibited from flying aboard the same aircraft.

52.     Once Alaska Manager Noor escorted Plaintiffs to the ticket counter area, uniformed individuals approached and identified themselves as agents with the Federal Bureau of Investigations ("FBI") and Transportation Security Administration ("TSA").

53.     Alaska Manager Noor showed Plaintiff Dirar's phone to an individual believed to be an FBI agent and allowed the agent to photograph Plaintiff Dirar's text messages.

54.     The above-mentioned FBI agent also photographed both Plaintiffs' photo identification.

55.     Port of Seattle Police Officer Andrew Neisinger ("Officer Neisinger") also arrived on scene in response to a prior call for assistance.

56.     According to a Port of Seattle police report, Officer Neisinger spoke with an unnamed Alaska Airlines manager who reported to Officer Neisinger that the incident involving Plaintiffs was "a misunderstanding between passengers," that "everything was fine," that "there was no threat of any kind," and that "police were no longer needed."

LUIS F. SEGURA (WSBA #58859)
CAIR WASHINGTON
1511 THIRD AVE., # 788, SEATTLE, WA 98101
(719) 629-7753

57.     After having confirmed to Officer Neisinger that there was no threat, the same above-mentioned unnamed Alaska Airlines manager also told Officer Neisinger that Alaska Airlines personnel still intended to deplane the other passengers to "show them that Alaska Airlines was concerned about their security and took this incident seriously."

58.     Additionally, according to Officer Neisinger's report, an unnamed female Alaska Airlines manager also approached and asked Officer Neisinger whether a K-9 unit could be deployed to scan the airplane despite Alaska Airlines having already discovered that Plaintiffs posed no threat.

59.     All statements made to Officer Neisinger by Alaska Airlines personnel which are quoted in this Complaint are documented in his official incident report.

60.     Based upon a review of Plaintiffs' description of events and details contained within Officer Neisinger's report, it is believed at this time that the Alaska Airlines managers who spoke with Officer Neisinger were Alaska Manager Noor and Unnamed Female Alaska Manager.

61.     Additionally, to Officer Neisinger's report, Alaska Captain ordered the emptying of the tanks in the first-class lavatory which had been used by Plaintiff Elamin prior to removal from the airplane.

62.     Prior to leaving the scene, Officer Neisinger also personally interviewed Plaintiff Dirar, and Plaintiff Dirar cooperated by politely answering all questions and allowing Officer Neisinger to view and photograph the text messages on his phone.

63.     Upon information and belief, no threat of any kind was identified after inspection of Plaintiffs, their property, or the Flight 304 aircraft.

LUIS F. SEGURA (WSBA #58859)
CAIR WASHINGTON
1511 THIRD AVE., # 788, SEATTLE, WA 98101
(719) 629-7753

64.     While at the gate area, TSA and FBI personnel arrived on scene and assembled alongside Plaintiffs in plain view of other passengers.

65.     After deplaning the other Flight 304 passengers, Alaska Airlines personnel escorted said passengers directly past Plaintiffs as they were being questioned by uniformed law enforcement personnel.

66.     Plaintiffs noticed the above-mentioned passengers staring at them and appearing visibly agitated and scared, with some passengers cursing and expressing anger.

67.     All ticketed Flight 304 passengers, except for Plaintiffs, were permitted to reboard the aircraft after rescreening.

68.     Upon information and belief, the above-mentioned Flight 304 passengers were escorted to the front of the security line for expedited entry, an opportunity that was denied to Plaintiffs.

69.     Alaska Manager Noor told Plaintiffs that, due to the events and Alaska Airlines procedure, Plaintiffs would be reticketed for later flights but would not be permitted to travel together.

70.     At the C-Concourse Alaska Airlines ticket desk, and in the presence of Plaintiffs, Alaska Manager Noor and Unnamed Female Alaska Manager instructed an unidentified ticket agent to rebook Plaintiffs for later Alaska Airlines flights, specifying that Plaintiffs were prohibited from traveling together.

71.     The unidentified ticket agent, pursuant to Alaska Manager Noor and Unnamed Female Alaska Manager's instruction, reticketed Plaintiffs for separate flights, which denied plaintiffs the opportunity to travel together as they had originally contracted for and caused Plaintiff Elamin's ticket to be downgraded from first-class to coach.

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 13

72.	Once reticketed for their respective later flights, Plaintiffs politely asked Alaska Manager Noor to facilitate their rescreening process as Alaska Airlines personnel had done for the other Flight 304 passengers, and Alaska Manager Noor refused, sending Plaintiffs to the back of the TSA security line for rescreening.

73.	As a result of the above-described actions by Alaska Airlines personnel, Plaintiffs were forced to re-submit to an extensive baggage screening and reach their destination separately, several hours later than originally scheduled.

74.	Upon information and belief, Alaska Airlines knew of the prevalence of Islamophobic, racist, and xenophobic stereotypes and negative sentiments towards Muslims in air travel, particularly among American passengers in the years following the attacks on September 11, 2001.

75.	Upon information and belief, Alaska Airlines knew that discriminating against Plaintiffs by removing and barring them from their scheduled flight, using them as props to conduct an unnecessary display of security theater for other passengers, and prohibiting them from traveling together would stoke the Islamophobic, racist, and xenophobic fears of other passengers and have a lasting traumatic effect on Plaintiffs yet still proceeded with their inappropriate discriminatory treatment.

76.	Upon information and belief, Alaska Airlines singled out and removed Plaintiff Dirar, a Black, bearded, ethnically Sudanese, Middle Eastern-born, Arabic-speaking, heavily-accented Muslim man from his scheduled flight after a non-Arabic speaking passenger felt threatened upon seeing Arabic messages he did not understand on Plaintiff Dirar's personal phone screen.

LUIS F. SEGURA (WSBA #58859)
CAIR WASHINGTON
1511 THIRD AVE., # 788, SEATTLE, WA 98101
(719) 629-7753

77.     Upon information and belief, Alaska Airlines singled out and removed Plaintiff Elamin, a Black, bearded, ethnically Sudanese, Middle Eastern-born, Arabic-speaking, heavily-accented Muslim man from his scheduled flight merely because he traveled with Plaintiff Dirar and matched the same profile, and not based on any complaint whatsoever.

78.     After confirming to Officer Neisinger that Plaintiff Dirar's text messages were innocuous and that Plaintiffs posed "no threat of any kind," as documented in Officer Neisinger's report, Alaska Airlines still discriminated against Plaintiffs by using them in an unnecessary and unjustified display of security theater for the other Flight 304 passengers which included: deplaning all the passengers; allowing said passengers to see Plaintiffs as the culprits by escorting them past Plaintiffs as Plaintiffs were surrounded by uniformed law enforcement; ordering the emptying of the first-class lavatory tanks used by Plaintiff Elamin and requesting a K-9 response; rescreening all Flight 304 passengers prior to reboarding while denying Plaintiffs the same expedited screening opportunity that was offered to the other passengers; extensively rummaging through Plaintiffs bags in their second screening; and barring Plaintiffs from reboarding Flight 304.

79.     After confirming that Plaintiff Dirar's text messages were innocuous and that Plaintiffs posed no threat, and after having already confirmed those findings in their direct statements to police officers, Alaska Airlines further discriminated against Plaintiffs by unnecessarily reticketing them for flights scheduled to land several hours later than their originally-booked flights and barring them from traveling together on said flights, while also downgrading Plaintiff Elamin's first-class ticket in the process.

80.     Defendant deprived Plaintiffs of their contractual right to travel together on their confirmed and paid-for trip aboard Flight 304, and Plaintiff Elamin, despite later being

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 15

reimbursed for the value of the downgraded ticket, was deprived of his contracted-for first-class seat and the difference in value of the first-class ticket.

81.     On February 17, 2020, due to Defendant's above-described discriminatory actions, Plaintiffs suffered intense stress, fear, and humiliation.

82.     Since the date of the incident, Plaintiffs have suffered anxiety and a persistent concern that Defendant's conduct towards them contributed to harmful stereotypes about Muslims in America.

83.     The persistent trauma and fear resulting from Defendant's actions has forced Plaintiffs to avoid travel by air whenever possible, thereby forcing them to opt for uncomfortably long, expensive, and time-consuming road trips and negatively impacting both their personal and business prospects.

84.     Due to the persistent trauma and fear resulting from the Defendant's actions, when air travel is necessary, Plaintiffs feel compelled to alter their behavior in several ways including the following: avoiding taking flights together; arriving at the airport much earlier than usual to account for delays from potential similar discriminatory treatment; avoiding use of their cell phones and keeping them powered off whenever possible; avoiding speaking in their native Arabic as much as possible.

85.     Plaintiffs now live with the persistent anxiety about future similar discrimination during air travel negatively impacting anyone with whom they consider traveling.

86.     Upon information and belief, most non-Arabic, non-Middle Eastern, and non-Muslim travelers do not feel compelled to take similar defensive measures against misidentification as a security threat that Plaintiffs and others with their shared identity are burdened with as a result of Defendant's discrimination.

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 16

#### IV.    FIRST CAUSE OF ACTION

**(Deprivation of Federal Civil Rights 42 U.S.C § 1981— "Civil Rights Act of 1991")**

87.     Plaintiffs hereby re-plead, re-allege, and incorporate all previous allegations of this Complaint, as if fully set forth herein.

88.     Plaintiffs are members of racial and ethnic minority groups as Black, Middle Eastern, ethnically Sudanese men.

89.     At all times relevant hereto, Plaintiffs, despite their minority identities, had the same civil right to be treated equally in making and enforcing contracts as white citizens, and to be subject to the same punishments, pains, penalties, taxes, license and exactions of every kind, and to no other, pursuant to 42 U.S.C. § 1981.

90.     42 U.S.C. § 1981 prohibits intentional racial, ethnic, and ancestry-based discrimination in the making and enforcing of contracts involving both public and private actors.

91.     Stemming from this right, Plaintiffs had the right to performance, benefits, privileges, terms, and conditions of the contracts into which they entered.

92.     As such, when Plaintiffs contracted with Alaska Airlines, a commercial air carrier engaged in air transportation services, for first-class passage aboard Flight 304 from Seattle-Tacoma International Airport to San Francisco International Airport, as paying passengers and contracting parties, they had the right to be treated equally and in a manner free from discrimination pursuant to 42 U.S.C. § 1981.

93.     Plaintiffs had equal rights to the performance, benefits, privileges, terms, and conditions of their contract with Alaska Airlines for travel on the commercial air carrier pursuant to 42 U.S.C. § 1981.

LUIS F. SEGURA (WSBA #58859)
CAIR WASHINGTON
1511 THIRD AVE., # 788, SEATTLE, WA 98101
(719) 629-7753

94.     At no point did Plaintiffs engage in any threatening, loud, rowdy, unruly, inciteful, or inappropriate behavior and, at all times relevant hereto, Plaintiffs abided by all rules and regulations of aircrafts and airline security.

95.     On the contrary, according to Alaska Airlines, as reflected in their official statement to Port of Seattle Police, the incident was a "misunderstanding between passengers," "everything was fine," and "there was no threat of any kind."

96.     Plaintiff Dirar simply used his cell phone prior to take-off aboard a stationary aircraft and Plaintiff Elamin simply used the restroom during an announced delay, as did many of the white passengers aboard the same flight; however, only Plaintiffs were racially profiled, singled out, removed, questioned, and barred from their contracted-for flight simply for communicating in their native language.

97.     Both Plaintiffs were removed from the aircraft after a non-Arabic speaking co-passenger expressed concern about seeing Plaintiff Dirar texting in Arabic, and said complaint was promptly disproven by an Arabic-speaking Alaska Airlines employee with full access to review the texts in question on Plaintiff Dirar's phone and confirm that the texts were completely innocuous and posed no security concern.

98.     No passenger complaint was raised against Plaintiff Elamin at all, yet he was also racially discriminated against through wrongful removal and exclusion from Flight 304 due to his shared racial, ethnic, and linguistic profile with Plaintiff Dirar.

99.     At all times relevant hereto, Plaintiffs were fully cooperative with all Alaska Airlines and law enforcement inquiries and directives, and Alaska Airlines' official statements to police provide no claims to the contrary.

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 18

100.    Plaintiffs' removal and denial of transport aboard Flight 304 was based solely on an admittedly unsubstantiated and disproven racist co-passenger complaint against Plaintiff Dirar, as confirmed by Alaska Airlines' official statements to police, and not based on any actual violation of any terms of their contract for travel aboard said flight.

101.    Alaska Airlines' decision to racially discriminate against Plaintiffs by barring them from their contracted-for flight and use both Plaintiffs as scapegoats in an admittedly unnecessary and unjustified display of security theater was made after Alaska Airlines had already confirmed that a co-passenger's complaint against Plaintiff Dirar was unsubstantiated and disproven, as documented in the police report.

102.    Plaintiffs, who are Black, Middle Eastern, ethnically Sudanese men, were the only passengers barred from their contracted-for seats aboard Alaska Airlines Flight 304.

103.    As such, Plaintiffs' civil rights under 42 U.S.C. § 1981 were violated because they were denied equal treatment in making and enforcing their contract with Alaska Airlines, and were not subject to the same punishments, pains, penalties, and exclusions as white citizens.

104.     Plaintiffs were unable to enjoy the performance, benefits, privileges, terms, and conditions of the contract into which they entered with Alaska Airlines because they were wrongfully removed and barred from their contracted-for seats aboard Alaska Airlines Flight 304 without any valid exception.

105.    In wrongfully removing and barring Plaintiffs from their contracted-for flight, Alaska Airlines intentionally and purposefully discriminated against Plaintiffs based on their perceived minority identities, including their race.

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 19

106.    Alaska Airlines is liable for the actions of its agents and employees, under the doctrine of *respondeat superior*.

107.    Upon information and belief, Alaska Manager Noor, Alaska Captain, Unnamed Female Alaska Manager, and all Alaska Airlines Flight 304 personnel were acting in the course of their employment as Alaska Airlines agents employed by Alaska Airlines at the time they discriminated against Plaintiffs by wrongfully removing and barring them from Flight 304 and used them as scapegoats in an admittedly unnecessary and unjustified display of security theater.

108.    Alaska Airlines had no legitimate reason or justification to remove and bar Plaintiffs from Flight 304, to use Plaintiffs in an unnecessary display of security theater, to treat Plaintiffs worse than the other Flight 304 passengers in the re-screening process, or to prohibit Plaintiffs from traveling together and deny them of their contractual rights except for racial bias and discrimination, thereby making this discrimination intentional and purposeful.

109.    Alaska Airlines had a duty to uphold its contractual duties and obligations to Plaintiffs and not act out of intentional, purposeful discrimination, but instead, it disregarded these duties and acted in an arbitrary and capricious manner by taking the above-described actions for no sound purpose.

110.    The arbitrary and capricious nature of Alaska Airlines' racially discriminatory actions towards plaintiffs is confirmed by their above-described documented statements to Police Officer Neisinger as well as the fact that Alaska Airlines still re-booked Plaintiffs on subsequent flights that same day, thereby providing further evidence that the above-

LUIS F. SEGURA (WSBA #58859)
CAIR WASHINGTON
1511 THIRD AVE., # 788, SEATTLE, WA 98101
(719) 629-7753

described co-passenger complaint against Plaintiff Dirar had been disproven and that Defendant did not perceive Plaintiffs as a threat.

111.     Ultimately, because Alaska Airlines failed to uphold its contractual obligations and violated Plaintiffs' rights under 42 U.S.C. § 1981, Plaintiffs were removed and barred from Flight 304, stigmatized before their fellow passengers, prohibited from traveling together on subsequent Alaska Airlines flights, and forced to arrive at their destination hours later than their originally scheduled flight.

112.     As a direct and proximate result of this intentional racial discrimination, denial of equal rights and benefits, Plaintiffs have suffered from stigmatization, mental and emotional distress, damage to their personal and professional reputation and opportunities, fear and apprehension associated with air travel, and immense pressure to avoid the attention of others and conduct themselves in ways which conceal their racial and ethnic minority identity.

## V.     SECOND CAUSE OF ACTION

### (Violation of Washington State Law Against Discrimination RCW 49.60.030)

113.     Plaintiffs hereby re-plead, re-allege, and incorporate all previous allegations of this Complaint, as if fully set forth herein.

114.     Plaintiffs are members of racial and ethnic minority groups as Black, Muslim, Middle Eastern, Sudan-born men.

115.     Washington State's Law Against Discrimination, RCW 49.60.030, ("WLAD") secures the right to "full enjoyment" of any place of public accommodation without acts directly or indirectly causing persons of a protected class to be treated as not welcome, accepted, desired, or solicited.

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 21

LUIS F. SEGURA (WSBA #58859)
CAIR WASHINGTON
1511 THIRD AVE., # 788, SEATTLE, WA 98101
(719) 629-7753

116.     WLAD prohibits any person or their agent or employee from committing any act which directly or indirectly results in any distinction, restriction, or discrimination on the basis of a person's membership in a protected class, including race, creed, color, national origin, citizenship, or immigration status in "accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement."

117.     RCW 49.60.040(2) provides that, under WLAD, "'any place of public resort, accommodation, assemblage, or amusement' includes, but is not limited to, any place, licensed or unlicensed, kept for gain, hire, or reward, or where charges are made for admission, service, occupancy, or use of any property or facilities . . . or for public conveyance or transportation on land, water, or in the air, including the stations and terminals thereof and the garaging of vehicles, or where food or beverages of any kind are sold for consumption on the premises . . ."

118.     Alaska Airlines' aircraft stationed at Seattle-Tacoma International Airport for the purpose of transporting passengers are public accommodation spaces under WLAD.

119.     Under WLAD, an employer is strictly liable for the discriminatory acts of its employees or agents against patrons in its spaces of public accommodation and cannot escape liability by asserting a lack of fault or negligence in training or supervision.

120.     Upon information and belief, the pilot, flight crew, supervisors, and gate agents for Alaska Airlines Flight 304 on February 17, 2020, were at all relevant times agents and/or employees of Alaska Airlines.

121.     Defendant's discriminatory removal and barring of Plaintiffs from their contracted-for passage aboard Alaska Airlines Flight 304, use of Plaintiffs in an admittedly unjustified and unnecessary display of security theater, and denial of Plaintiffs the right to travel

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 22

together on subsequently-booked Alaska Airlines flights was based on Plaintiffs race, religion, color, and national origin and denied Plaintiffs the full enjoyment of the services and privileges offered in its public accommodations spaces in violation of Plaintiffs' civil rights under WLAD.

122.     As a direct and proximate result of Alaska Airlines employees' aforementioned discriminatory treatment of Plaintiffs who were paying customers within Alaska Airlines' spaces of public accommodation, Plaintiffs were made to feel unwelcome, unaccepted, and undesired based on their minority identities and have suffered from stigmatization, mental and emotional distress, damage to their personal and professional reputation and opportunities, fear and apprehension associated with air travel, and immense pressure to avoid the attention of others and conduct themselves in ways which conceal their minority identities.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Dirar and Elamin pray for judgment against Defendant Alaska Airlines as follows:

a.     An injunction prohibiting Defendant from discriminating against passengers and customers on the basis of their religion, race, color, ethnicity, alienage or national origin;

b.     An injunction ordering Defendant to provide racial and religious sensitivity training to all employees;

c.     An injunction ordering Defendant to establish culturally sensitive protocols and procedures regarding the verification and handling of

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 23

LUIS F. SEGURA (WSBA #58859)
CAIR WASHINGTON
1511 THIRD AVE., # 788, SEATTLE, WA 98101
(719) 629-7753

passenger complaints, particularly in instances when said complaints are unsubstantiated;

d.  An award to Plaintiffs for all economic damages, including but not limited to, reimbursement of flight tickets and compensation for delays;

e.  An award to Plaintiffs for non-economic damages in an amount to be determined at trial for Plaintiffs' loss and injury, including but not limited to, fear, anxiety, humiliation, stigmatization, trauma, embarrassment, and emotional distress;

f.  An award to Plaintiffs for punitive damages in an amount to be determined at trial that would punish Alaska Airlines for its intentional, malicious, willful, callous, wanton, and reckless disregard for Plaintiffs' rights that would effectively deter Defendant from engaging in similar conduct in the future;

g.  Statutory damages;

h.  An award of attorneys' fees, costs, and expenses incurred in this action; and

i.  Any further relief to which Plaintiffs are entitled or that this Honorable Court may deem just and proper under the circumstances.

CIVIL COMPLAINT FOR DAMAGES AND JURY DEMAND - 24

## VII.   JURY DEMAND

Plaintiffs hereby demand trial by jury.


Respectfully submitted,

By: s/ Luis F. Segura
    Luis F. Segura (WSBA #58859)
    lsegura@cair.com
    Council on American-Islamic Relations, Washington State

    Lena F. Masri (MI P73461)*
    lmasri@cair.com
    Gadeir I. Abbas (VA 81161)*
    gabbas@cair.com
    Justin Sadosky (D.C. 977642)*
    jsadosky@cair.com
    CAIR Legal Defense Fund


    Attorneys for Plaintiffs
    *Pro Hac Vice application pending


Dated: August 2, 2022

LUIS F. SEGURA (WSBA #58859)
CAIR WASHINGTON
1511 THIRD AVE., # 788, SEATTLE, WA 98101
(719) 629-7753