UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ABOBAKKR DIRAR and MOHAMED ELAMIN,<br><br>Plaintiffs,<br><br>v.<br><br>ALASKA AIRLINES, INC.,<br><br>Defendant. | Case No. C22-1076-RSM<br><br>ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT |

## I.  INTRODUCTION

This matter comes before the Court on Defendant Alaska Airlines Inc. ("Alaska")'s Motion for Summary Judgment. Dkt. #41. Plaintiffs Abobakkr Dirar and Mohamed Elamin oppose Alaska's Motion in its entirety and filed their own Motion for Summary Judgment. Dkt. #46. Having reviewed Defendant's Motion, Plaintiffs' Opposition and Motion, and all documents submitted in support thereof, the Court DENIES Defendant's Motion for Summary Judgment, and DENIES Plaintiffs' Motion for Summary Judgment.

## II.  BACKGROUND

Plaintiffs claim that Alaska discriminated against them on the basis of their race, national origin and/or ethnicity under 42 U.S.C. § 1981 and Washington State Law Against Discrimination (RCW 49.60.030) by wrongfully removing them from an airline flight. Abobakkr Dirar and Mohamed Elamin are friends and colleagues who are both male, Black, Muslim,

ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT - 1

bearded, Sudan-born citizens of the United States who predominantly speak Arabic and some English with a pronounced Arabic accent. Dkt. #1. On February 17, 2020, Plaintiffs were seated in the first-class section of Alaska Airlines Flight 304, stationed at the C-Concourse gate of Seattle-Tacoma International Airport, awaiting departure for a business trip to San Francisco. *Id.* Captain Phillip Reda was the pilot in command. Dkt. #4 at 5.

Mr. Dirar and Mr. Elamin are business partners in the medical transport business, which specializes in transporting people to doctor's appointments, kidney dialyses appointments, and the like. Dkt. #46-12, at 10. They were on their way to San Francisco to purchase two vehicles for their business, which they intended to drive back to Washington State the next day. *Id.* Plaintiff Dirar was seated in business class seat 2C and Plaintiff Elamin was seated across the aisle in seat 2F. Dkt. #41, Figure 2. Next to Mr. Dirar, a white, middle-aged passenger, Christopher Chapeta, was seated with his laptop in his lap. Dkt. #46-13, at 35.

While waiting for takeoff, Mr. Dirar was texting with a Sudanese friend and fellow Washington State resident named Mutasim Mukhtar. Dkt. #46-12, at 35. Passenger Chapeta observed this and informed a flight attendant that he wished to disembark the plane to speak with Captain Reda. Dkt. #46-15 at 36. While waiting for the flight to take off, Mr. Elamin asked a female flight attendant if he could use the restroom, and she said, "Yes. Go ahead." Dkt. #46-13 at 33.

The precise details of what Passenger Chapeta shared with Captain Reda, and the factors that contributed to Captain Reda's ultimate decision to deplane the Plaintiffs remain in dispute. Captain Reda will testify that Passenger Chapeta told him that he had a background in security and had seen "the word 'mutasim,' some Arabic symbols, 'captain,' some emojis of middle fingers, and airplanes flying into buildings" on the cell phone of the passenger seated next to him.

ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT - 2

Dkt. #46-6, ¶1. No Alaska employee confirmed Passenger Chapeta's security credentials. Dkt. #46-11, at 44. Passenger Chapeta then showed Captain Reda a recreation of what he had observed, typing out emojis on his own phone. Dkt. #41, Figure 1. Passenger Chapeta also reported that Mr. Dirar and Mr. Elamin were glancing at each other, across the aisle. Dkt. #46-1 at 46 and Dkt. #46-11 at 50. Neither Passenger Chapeta nor Captain Reda were familiar with the Arabic language. Dkt. #46-15 at 26. Captain Reda will testify he googled "mutasim" which came up with multiple meanings including a person's name, or "blessing;" he then googled "mutasim + terrorist" collectively and found an Islamic Free Syrian Army faction. Dkt. #46-15 at 62.

The captain then requested the presence of an Alaska supervisor, Veronica Matejski. Dkt. #46-14, at 42. Passenger Chapeta repeated what he had told Captain Reda to Supervisor Matejski and shared that he believed the texts were being exchanged with a man on the other side of the aisle. *Id.* at 43. Captain Reda decided to deplane Mr. Dirar and Mr. Elamin to better understand the texts, while Supervisor Matejski called Alaska Guest Services Manager Jason Aspelund, who in turn contacted Alaska Manager Nooredine Elkihal, who speaks Arabic. Dkt. #41.

Managers Elkihal and Matejski escorted Mr. Dirar and Mr. Elamin to the C-17 service center, outside the gate but in the corner of the concourse, where two police officers and the captain were waiting. Dkt. #46-12, at 58. Manager Elkihal asked the Plaintiffs if he could ask them a few questions about what was observed on their phones, and Mr. Dirar provided Manager Elkihal his phone to review the messages. Dkt. #46-8, ¶3. After reviewing the messages, Manager Elkihal told Captain Reda that the texts were Mr. Dirar joking with a friend, and that the emojis were in response to a question about pictures. *Id.*, ¶4. The captain insisted on seeing the emojis himself, however Mr. Dirar will testify he deleted the emojis he had previously showed Manager

ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT - 3

Elkihal because he was scared. Dkt. #46-12, at 77. Captain Reda was told that the text messages were altered. Dkt #41-5 at 81.

Captain Reda will testify he felt there were multiple red flags pointing to a possible security threat, namely that the text included "911," "Mutasim," and "Captain;" that Mr. Dirar deleted some of the text messages; and that Mr. Elamin used the lavatory "quickly." Dkt. #46-8, ¶6. Captain Reda determined that both men would not fly on Flight 304. Dkt. #46-15, at 131. He then directed that the airplane be unloaded and that a security sweep be conducted. *Id.*, at 138. He added servicing the lavatory to the list of items to resecure the aircraft in case something had been flushed down the toilet or planted under the sink. *Id.*

The Port of Seattle Police Report states that when the first police officer arrived, an Alaska Manager told him that the incident was, "a misunderstanding between passengers," that "everything was fine," that "there was no threat of any kind," and that "police were no longer needed." Dkt. #46-10, at 2. Another Alaska gate agent approached the officer and told him that Alaska was going to have the passengers deplane and be re-screened. *Id.* Then the first Alaska Manager told the officer Alaska was, "deplaning the passengers to show them that Alaska Airlines was concerned about their security and took the incident seriously." *Id.*

Alaska had all passengers deplane and go through another round of screening by TSA, re-secured the luggage on board the aircraft, requested a K-9 unit search the plane, and emptied the first-class aircraft lavatory as a pre-caution. Dkt. #46-13 at 31. All ticketed Flight 304 passengers, except for the Plaintiff passengers, were permitted to re-board the aircraft after TSA re-screening, and the flight ultimately departed for San Francisco. Dkt. #46-2 at 1. Meanwhile, Mr. Dirar and Mr. Elamin spoke with Port of Seattle Police, TSA, and FBI Officials. Dkt. #46-12 at 59.

ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT - 4

After an unknown period of time, the officers cleared the men to fly. *See generally* Dkt. #46-10. Mr. Elkihal told the men they would be rebooked but that Captain Reda had suggested they travel on separate flights. Dkt. #46-8, ¶6. Mr. Dirar departed for San Francisco on Alaska Airlines Flight 1754 at 5:25 12 p.m., while Mr. Elamin departed on Alaska Airlines Flight 1752 at 4:45 p.m. Dkt. #41-3 at 13.

On August 2, 2022, Mr. Dirar and Mr. Elamin filed this lawsuit. Dkt. #1. Alaska now seeks summary judgment on Plaintiffs' claims under 49 U.S.C. § 44902(b) on the basis that an air carrier may refuse transport to passengers whose presence on the airplane might be inimical to safety. Dkt. #41. The Plaintiffs seek summary judgment on the basis that Alaska cannot show a legitimate, non-discriminatory reason for its treatment of the Plaintiffs, and even if it could, Plaintiffs have established pretext. Dkt. #46 at 34.

### III. DISCUSSION

#### A. Legal Standard for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Id.* at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S.*

*Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B. Discriminatory Removal of Airline Passengers under 42 U.S.C. § 1981(a)

Mr. Dirar and Mr. Elamin claim that their removal from Flight 304 constitutes discrimination under 42 U.S.C. § 1981(a). Section 1981 provides, in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...."*Id.* A claim under Section 1981 requires a plaintiff to show intentional discrimination on account of race. *Evans v. McKay*, 869 F.2d 1341, 1344 (9th Cir. 1989) (citing *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 376 (1982)).

To establish a prima facie case under Section 1981, a plaintiff must prove: "(1) that they are members of a racial minority; (2) that the defendants had an intent to discriminate on the basis of race; and (3) that the discrimination concerned one or more activities enumerated in the statute." *Modoc v. W. Coast Vinyl, Inc.*, No. 10-cv-05007-RJB, 2011 WL 1363785, at *7 (W.D. Wash. Apr. 11, 2011). There is no dispute that Plaintiff passengers, two Black, Sudanese, and Middle Eastern men who predominantly speak Arabic, meet the first element. Parties likewise do not dispute the third element, since Plaintiffs claim discrimination in their right to contract with Alaska Airlines through purchase of their airline tickets. The Court's focus on this summary judgment motion is therefore the second element: whether Alaska intended to discriminate against Mr. Dirar and Mr. Elamin on the basis of race, ethnicity, or national origin.

To prove intentional discrimination under Section 1981, a plaintiff must prove racial animus either through direct evidence, such as derogatory or offensive comments, or through circumstantial evidence. *Lindsey v. SLT Los Angeles*, LLC, 447 F.3d 1138, 1152 (9th Cir. 2006). Plaintiffs offer no direct evidence of discrimination by Captain Reda, or any other member of the Alaska flight crew, and instead point to circumstantial evidence to create an inference of discrimination against the Plaintiffs. *See generally* Dkt. #46. Circumstantial evidence for individual claims of discrimination is evaluated under the *McDonnell Douglas* framework. *White v. Cal.*, 754 Fed. Appx. 575, 576 (9th Cir. 2019). Under this burden-shifting framework, a plaintiff must first establish a prima facie case proving (1) he is a member of a protected class; (2) he attempted to contract for certain services; (3) he was denied the right to contract for those services; and (4) such services remained available to similarly situated individuals who were not members of plaintiff's protected class. *Lindsey*, 447 F.3d at 1144–45 (9th Cir. 2006). If a plaintiff establishes a prima facie case, then the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the adverse action. Upon doing so, the burden shifts back to plaintiff to prove, with "specific and substantial" evidence, that the reason was merely pretext for intentional discrimination. *Id.*, at 1152.

1. **Plaintiffs'** *prima facie* **case**

The parties do not dispute that Plaintiffs satisfy the first three elements. On the fourth element, Plaintiffs contend that the "similarly-situated" standard is not an appropriate requirement for a *prima facie* case under the circumstances present here. Dkt. #46 at 27. Plaintiffs urge this Court to follow Sixth Circuit precedent and convert this fourth element to the standard of whether Alaska treated Plaintiffs in a "hostile manner, outside of widely-accepted norms." *Id.* at 28 (citing *Wachuku v. Jet Blue Airways Corp.*, No. 220CV01061VAPPVCX, 2021 WL

ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT - 7

4497497, at *4 (C.D. Cal. July 14, 2021). However, the Ninth Circuit has not expressly adopted this modification of the *McDonnell Douglas* framework. *Lindsey*, 447 F.3d at 1145 (9th Cir. 2006) ("Although we find the Sixth Circuit's reasoning compelling, we need not decide today whether its modification of the fourth element of a *prima facie* case under section 1981 is required in many or all cases arising in a commercial, non-employment context."). Because of this open question, courts within the Ninth Circuit have continued to apply the traditional "similarly-situated" standard while acknowledging that the outcome would not change under the "reasonable person" standard. *See Portfolio Investments, LLC v. First Sav. Bank*, No. C12-104 RAJ, 2013 WL 1187622, at *5 (W.D. Wash. Mar. 20, 2013), *aff'd sub nom. Portfolio Investments LLC v. First Sav. Bank Nw.*, 583 F. App'x 814 (9th Cir. 2014); *Harrison v. Wells Fargo Bank, N.A.*, No. C18-07824 WHA, 2019 WL 2085447, at *3 (N.D. Cal. May 13, 2019).

Here, Plaintiffs have asserted under the "reasonable person" standard, a reasonable trier of fact could conclude that Alaska treated Mr. Dirar and Mr. Elamin in a hostile manner outside of widely accepted norms. They argue that Captain Reda took actions that departed from his professional training, and Passenger Chapeta falsely accused Mr. Dirar and Mr. Elamin of posing a threat and succeeded in having them removed from the plane. Plaintiffs also address the "similarly situated" standard and argue that even if the Court applies this standard, a reasonable trier of fact could conclude that Alaska treated Mr. Dirar and Mr. Elamin less favorably than similarly situated passengers. The Court agrees with Plaintiffs under either standard. The Court will proceed through the remainder of the *McDonnell Douglas* framework to evaluate Plaintiffs' claim.

    **2.  Alaska's legitimate, non-discriminatory reason for removal**

ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT - 8

Having found that Plaintiffs have presented a triable issue of fact as to their *prima facie* case of discrimination, the burden shifts to Alaska to provide a legitimate, non-discriminatory reason for the adverse action. It is undisputed that Alaska has articulated such a reason under the Federal Aviation Act, which provides that an air carrier "may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." Dkt. #41 at 17 (citing 49 U.S.C. § 44902(b)). Plaintiffs argue that the reason for removal was discriminatory, while Alaska argues that the reason for removal was safety related. *See generally* Dkt. #41 and Dkt. # 46. This dispute is properly considered in the discussion of pretext below. Since Alaska has argued a legitimate nondiscriminatory reason for removal, Alaska has met their burden.

### 3. Plaintiffs' burden of establishing pretext

Once a defendant presents a legitimate, non-discriminatory reason for its actions, the presumption of discrimination "drops out of the picture" and the burden shifts back to plaintiff to prove the proffered reasons were a pretext for discrimination. *Lindsey*, 447 F.3d at 1148 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11 (1993)) (internal quotations omitted). Plaintiff may prove pretext one of two ways: (1) indirectly, by showing the defendant's proffered explanation is "unworthy of credence," or (2) directly, by showing that unlawful discrimination more likely motivated the defendant. *Chuang v. Univ. of Cal. Davis, Bd. of Trs.,* 225 F.3d 1115, 1127 (9th Cir. 2000).

Under the *McDonnell Douglas* burden shifting framework, the key remaining issue is pretext. At this stage, the Court's only function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Credibility determinations, weighing of evidence, and drawing of legitimate inferences from the facts are

ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT - 9

responsibilities of a jury. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986).

Here, Plaintiffs argue that Alaska's proffered reasons for subjecting Mr. Elamin and Mr. Dirar to extra screening and questioning, and then nonetheless rebooking them on different flights are "completely unbelievable." Dkt. #46 at 34. Defendant argues that the contemporaneous reports of the persons directly involved in this case are consistent in demonstrating Captain Reda's belief that the Plaintiffs' presence on the flight might be inimical to safety. Dkt. #47 at 20.

The Court rejects Plaintiffs' argument that the proffered reasons presented by Alaska are "completely unbelievable." Captain Reda will testify to the information he received, and the "red flags" that ultimately influenced his decision to remove Plaintiffs from the plane. Given this testimony, it is entirely possible that a reasonable juror could find Captain Reda believable. Plaintiffs also argue that summary judgment should be granted for Mr. Elamin because the only safety concern pertaining to him was that he used the bathroom in a "suspicious" manner. Dkt. #46, at 40. However, since Plaintiffs were traveling together, the Court concludes there is a genuine dispute of material fact as to Mr. Elamin's involvement with Mr. Dirar regarding the safety concerns raised during the time of the incident. For these reasons, summary judgment cannot be granted in favor of Plaintiffs.

The Court also rejects Defendant's argument that it has proven Plaintiffs might have been a safety risk based on the testimony of witnesses who were directly involved in the incident. Such testimony does not necessarily establish that Plaintiffs' presence on the flight was in fact inimical to safety. One witness may testify that the text messages were misinterpreted at the time and

ultimately harmless, while another witness may testify that the use of certain emojis is inappropriate on an airplane. The credibility of these witnesses are at issue.

A passenger's removal is proper under Section 44902 so long as the pilot's decision is not arbitrary or capricious. *Cordero v. Cia Mexicana De Aviacion, S.A.,* 681 F.2d 669, 672 (9th Cir. 1982) ("[I]f the passenger is excluded because the opinion of the pilot is arbitrary or capricious and not justified by any reason or rational appraisal of the facts, then the denial of passage is discriminatory"). Here, Captain Reda spoke with several individuals who provided different interpretations of Plaintiff's text messages, then, on his own accord, googled "mutasim + terrorist." Plaintiffs argue that even though the decisionmakers with whom Captain Reda consulted concluded that Plaintiffs did not present a safety threat, Captain Reda went beyond Alaska's clearly established norms by performing the google search. Dkt. #46 at 37. Under the arbitrary or capricious standard, while it is a close call, Alaska has not tipped the evidentiary scale enough to convince the Court that Captain Reda's decision to remove the passengers was proper as a matter of law. Because a reasonable juror could very well find that the removal of Plaintiffs was pretextual depending on the testimony of these witnesses, the Court will not grant summary judgment in favor of Defendant's claim.

C.   **State Law Claim**

Plaintiffs' remaining state law claim is for violation of Washington State Law Against Discrimination, RCW 49.60.030. Defendants move for summary judgment on this claim on the grounds that they are preempted by the Federal Aviation Act ("FAA"), specifically 49 U.S.C. § 44902(b). It is undisputed that Captain Reda made the decision to remove Plaintiffs from the plane. However, while he had discretion to act under § 44902(b), such discretion is not "a license to discriminate." *Bayaa v. United Airlines, Inc.,* 249 F.Supp.2d 1198, 1205 (C.D.Cal. 2002)

ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT - 11

(finding that § 44902 does not preempt civil rights claims under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d). Given the reasoning in *Bayaa* and the unique facts of this case, the Court declines to find that this claim is preempted. While Defendant may ultimately be able to show that Plaintiffs cannot prove discrimination under the Washington Law Against Discrimination, such a factual determination is not appropriate as part of the Court's inquiry on a motion for summary judgment.

## IV. CONCLUSION

Having reviewed the relevant briefing and the remainder of the record, the Court hereby finds and ORDERS that:

1. Alaska's Motion for Summary Judgment Dkt. #41, is DENIED; and
2. Plaintiffs' Motion for Summary Judgment Dkt. # 46, is DENIED.

DATED this 1st day of November, 2023.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE